UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN BERGHOLZ, | ) |
| Plaintiff, | ) 18 C 3 |
| vs. | ) Judge Gary Feinerman |
| JOHN MARSHALL LAW SCHOOL and ANTHONY NIEDWIECKI, | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

John Bergholz sued his former employer, John Marshall Law School, its former Associate Dean of Academic Affairs, Anthony Niedwiecki, and its current Dean, Angela Darby Dickerson, under Titles VII and IX of the Civil Rights Act of 1964, 20 U.S.C. § 1681 *et seq.* (Title IX), 42 U.S.C. § 2000e *et seq.* (Title VII), the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and Illinois law. Doc. 1. On Defendants' motion, the court dismissed all but Bergholz's Title VII and Title IX sex discrimination claims against John Marshall and state law claims against Niedwiecki. Docs. 61-62 (reported at 2018 WL 5622052 (N.D. Ill. Oct. 30, 2018)). With a jury trial set for April 27, 2020, Doc. 109, Defendants move for summary judgment, Doc. 78. The motion is granted as to the federal claims, and the court exercises its discretion under 28 U.S.C. § 1367(c)(3) to relinquish jurisdiction over the state law claims.

**Background**

The court recites the facts as favorably to Bergholz as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

1

### A. Bergholz's Hiring and Interactions with Dickerson

John Marshall was at all relevant times a private law school in Illinois. Doc. 90 at ¶ 2. Bergholz interviewed with John Marshall's Board of Directors for the position of Executive Director of Development and Alumni Relations. Doc. 98 at ¶ 1. On June 12, 2015, John Marshall offered Bergholz the position, and he accepted three days later. Doc. 90 at ¶ 5. The Board vote to hire Bergholz was unanimous and enthusiastic. Doc. 98 at ¶ 1.

Upon assuming his post, Bergholz developed a plan for the direction of the Development Office, and the Board approved that plan. Doc. 98 at ¶ 2. Bergholz's staff of eight responded well to his leadership at first. *Id*. at ¶ 3. Bergholz reported directly to then-Dean Bill Corkery. Doc. 90 at ¶ 7.

After Dickerson replaced Corkery as dean, the Board selected Niedwiecki to lead the transition. *Id*. at ¶ 29. During the transition, Niedwiecki told Dickerson that some members of Bergholz's staff complained that he had made inappropriate statements. *Id*. at ¶ 31.

On January 30, 2017, Dickerson asked Bergholz to review a list of active students whose relatives attended John Marshall to identify prospective donors or participants in a "Friends and Family Day" event. *Id*. at ¶ 49. Nineteen days later, Bergholz still had not responded, *ibid*., so Dickerson followed up, *id*. at ¶ 51. Bergholz was unable to provide Dickerson with the requested data because a subordinate had not yet compiled it for him. Doc 98 at ¶ 21. On February 22, that subordinate emailed the data to Bergholz, who promptly forwarded it to Dickerson. *Ibid*.; Doc. 90 at ¶ 50. Bergholz did so, however, without setting forth his views, leading Dickerson to respond: "Some explanation of your thoughts would be helpful." Doc. 90 at ¶ 50. Bergholz does not remember if he replied or discussed the data with Dickerson. Doc. 93-1 at ¶¶ 57-58; Doc. 93-2 at 48. Dickerson asked Bergholz again on March 5 and March 12 to

provide fundraising metrics. Doc. 90 at ¶ 51. Dickerson ultimately conducted her own research and proposed her own metrics to Bergholz. *Ibid.*

Bergholz wanted to discuss those metrics with Dickerson during a fundraising trip to Springfield, but Dickerson slept during the drive. Doc. 98 at ¶ 25. Dickerson stated that the trip to Springfield was the "last straw" leading to Bergholz's termination. Doc. 90 at ¶ 56. Dickerson's complaints about the trip—for example, that Bergholz failed to inform her of the trip's details, failed to meet with state legislators, and failed to wait for her before starting dinner—are either false or unjustified. Doc. 98 at ¶¶ 26-28.

B. **Complaints to Dickerson Regarding Bergholz**

Defendants cite several complaints that John Marshall employees, including members of Bergholz's staff, lodged with Dickerson about his conduct. Those complaint were false or ill-founded. Doc. 90 at ¶¶ 30-31, 35-42, 44, 55; Doc. 98 at ¶¶ 5, 8-13, 31, 37, 39. The court sets forth the complaints not to credit their validity, but solely for the fact that Dickerson received them. *See Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 796 (7th Cir. 2015) (holding that a negative reference from the plaintiff's former employer was not hearsay because it had been "considered not for its truth, but to show its effect on the state of mind" of the defendant hospital in rejecting the plaintiff's application); *Schindler v. Seiler*, 474 F.3d 1008, 1011 (7th Cir. 2007) ("[A] statement offered to show its effect on the person who heard the statement is not hearsay."). Moreover, insofar as the complaints include hearsay within hearsay, they are admissible insofar as each statement is considered for its effect on the listener rather than for its truth. *See* Fed. R. Evid. 805; *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) ("[W]hen a document contains multiple levels of hearsay, … each layer must be admissible. … To the extent the officers reported statements made by others—the robbery victims—those statements were not hearsay because they were not offered to prove that they were true.").

In July 2016, Bergholz performed annual evaluations for each member of his staff. Doc. 98 at ¶ 4. These evaluations were all positive, but Lauren Weiner believed hers was too low and sent Bergholz a letter arguing for an upward adjustment. *Ibid*. Later, in January or February 2017, Weiner told Dickerson that Bergholz made inappropriate comments to her about her pregnancy and marriage; that she was uncomfortable traveling with him for donor visits because she felt that he was trying to hit on her; that he transferred donors from her assigned list to his; that he travelled in a way that did not make him a good steward of school resources; and that some members of the alumni association were unhappy with their interactions with him. Doc. 90 at ¶ 36. Weiner made similar complaints to others, including Niedwiecki and Troy Riddle, John Marshall's Chief Diversity and Inclusion Officer and Title IX Coordinator. Doc. 98 at ¶ 5.

In late December 2016, Professor Susan Brody told Dickerson that Bergholz's serious conflicts with the current and past officers of the alumni association might hinder fundraising efforts. Doc. 90 at ¶ 35. Brody also told Dickerson that several female members of Bergholz's staff had complained to Brody about how he treated them. *Ibid*.

In early 2017, members of the alumni association board asked to meet with Dickerson to discuss Bergholz. *Id*. at ¶ 37. Dickerson was told that a female board member had a conflict with Bergholz that culminated in her leaving a meeting in tears, *ibid*., and that two female board members felt that Bergholz treated them inappropriately because they are women, *id*. at ¶ 38. In Spring 2017, Associate Dean Julie Spanbauer told Dickerson that she felt very uneasy with Bergholz during a work trip and did not want to travel with him again. *Id*. at ¶ 39.

At an unspecified time, Director of Marketing and Communications Michael Huggins told Dickerson that Bergholz refused to physically touch a document concerning LGBT issues as it was passed around the table at a senior staff meeting. *Id*. at ¶ 40. At the same meeting,

4

Dickerson observed Bergholz behaving strangely by doubling over and holding his head in his hands, feigning sickness. *Id.* at ¶ 52. When Dickerson asked Bergholz if he was feeling ill, he popped his head up and answered no. *Ibid.* (Bergholz denies both that he refused to touch a document concerning LGBT issues and that he held his head and stared at the floor during the meeting. Doc. 98 at ¶ 38. But while he supports the former denial with record evidence, he fails to do so for the latter, so it is deemed admitted. *See Ammons v. Aramark Uniform Servs.*, 368 F.3d 809, 817-18 (7th Cir. 2004).)

In March 2017, Riddle told Dickerson that Danielle Zimmerman, a member of Bergholz's staff, complained to him about how Bergholz treated her. Doc. 90 at ¶ 41. That same month, Judith Hamill, another member of Bergholz's staff, told Dickerson that Bergholz made comments about working on a plantation that particularly offended Francine Williams, an African-American employee; that Bergholz told Williams to get a gym membership; that Bergholz made inappropriate comments about Weiner's pregnancy; and that Bergholz made fun of and criticized Zimmerman after she complained that an alumnus insinuated that if she went on a date with the alumnus, he might donate to the school. *Id.* at ¶ 42. Dickerson knew that Zimmerman was known to be insubordinate and to behave poorly, with Bergholz having written her up for poor performance. Doc. 98 at ¶ 31.

Dickerson decided that Riddle's approach of informal meetings and lunches with Bergholz to discuss these complaints was insufficient to address them and that Riddle had not had sufficient training to conduct a Title IX investigation. Doc. 90 at ¶ 43. Dickerson considered launching a Title IX investigation by an outside law firm, which would have cost about $50,000 and been disruptive to John Marshall's operations. *Id.* at ¶ 44. Dickerson reported to John Marshall's Board in March 2017 that she was considering firing Bergholz. *Id.*

at ¶ 54. Two members of the Board responded that they had settled for Bergholz because he was the best applicant from a bad pool of applicants, that fundraising had been sluggish, and that they were not impressed with him. *Id*. at ¶ 55.

On April 5, 2017, Bergholz and Dickerson met. Doc. 93-1 at ¶ 72. Dickerson told Bergholz that they were not a good fit in terms of working together. *Ibid*. The next thing Dickerson mentioned was that she had heard complaints from four female members of his staff that could raise Title IX issues. *Ibid*. Dickerson then stated that she did not want to spend the money for a Title IX investigation and instead would terminate him. *Ibid*. Bergholz agrees that it is common and not inappropriate for a new leader at an organization to change staff or bring in new people, that a head of an educational institution and the head of development need to be a good fit and communicate well with each other, and that he knew he might lose his job when Dickerson replaced Corkery as dean. Doc. 90 at ¶ 45. Dickerson stated that the termination decision was hers alone. *Id*. at ¶ 65.

### C. Bergholz's Asserted Circumstantial Evidence of Sex Discrimination

After Bergholz was terminated, Weiner was appointed head of Development and Alumni Relations. Doc. 98 at ¶ 7; Doc. 96-3 at 3. Zimmerman was retained despite her reputation for insubordination and poor behavior. Doc. 98 at ¶ 31. Dickerson terminated the Associate Dean of Admissions—who, like Bergholz, was an untenured male staff member—without warning for alleged performance issues. *Id*. at ¶ 33.

Dickerson decided to change the status of five faculty members—four women and one man—who held the position of Associate Professor Non-Tenure Track. *Id*. at ¶ 32. The man was the only one of the five who was publicly identified as being unable to reapply for his job and for whom there were no alternative positions available. *Ibid*.

In May 2017, a female employee in the Registrar's Office used Dickerson's signature on letters without Dickerson's approval. *Id*. at ¶ 34. Instead of being disciplined or dismissed, the employee was promoted one month later. *Ibid*.

In 2017, Dickerson promoted two female employees in the Registrar's Office to Assistant Registrar. *Id*. at ¶ 35. A male employee not promoted to that post was transferred to an undefined security position consistent with a Dickerson-initiated policy prohibiting staff members from dating their supervisors. *Ibid*.

In the search for a replacement for the human resources director in 2017, Dickerson announced four finalists, three women and one man. *Id*. at ¶ 36. One of the women was hired for the position and the man was given a junior position. *Ibid*.

Dickerson criticized Bergholz for suggesting that John Marshal establish a scholarship fund in honor of Miss Criss, a long-serving staff member, who was alleged to have alienated some students with racist comments. *Id*. at ¶ 40. Dickerson did not terminate Miss Criss, but instead gave her a position working with donors to raise money and allowed her to retire six months later. *Ibid*.

Bergholz has no personal knowledge of the decisionmaking processes for any of these employment decisions. Doc. 90 at ¶ 66. (Bergholz denies this, but he fails to cite any record evidence indicating he has such personal knowledge, so the fact is deemed admitted. *See Ammons*, 368 F.3d at 817-18.) Bergholz has no knowledge of any woman who worked for John Marshall and was treated more favorably than he was, nor any woman whom he thinks should have been terminated and was not. Doc. 90 at ¶ 68. No women were in comparable positions to Bergholz at the time of his employment at John Marshall, and the men who were in comparable positions were replaced by women after Dickerson's appointment as dean. *Id*. at ¶¶ 68-69.

**Discussion**

**I.	Title VII and Title IX Claims Against John Marshall**

**A.	Title VII**

Title VII's antidiscrimination provision makes it "unlawful … for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under the framework set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), a Title VII claim survives summary judgment if the plaintiff presents evidence that, "considered as a whole," would allow a reasonable jury to find that his protected characteristic or activity caused an adverse employment action. *Id*. at 765. To meet this burden, Bergholz may rely on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), but that framework is just one way that the record can allow a reasonable jury to find sex discrimination. *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that *McDonnell Douglas* provides "a common, but not exclusive, method of establishing a triable issue of intentional discrimination") (internal quotation marks omitted). The court therefore must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question whether, in its entirety, "the evidence would permit a reasonable factfinder to conclude that [Bergholz's] … sex … caused the discharge." *Ortiz*, 834 F.3d at 765; *see also Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1004-05 (7th Cir. 2018) ("Although the oft-cited burden shifting framework from [*McDonnell Douglas*] provides a means of organizing, presenting, and assessing circumstantial evidence, we must consider the evidence as a whole in deciding whether to grant summary judgment.") (internal citations and quotation marks omitted).

Bergholz refers to both *McDonnell Douglas* and the general causation framework in defending his sex discrimination claim from summary judgment. Doc. 89 at 8-13. The court therefore will "begin [its] assessment of the evidence by employing [the *McDonnell Douglas*] construct and address[] first whether [Bergholz] has established" a genuine dispute under that framework. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). If Bergholz fails to do so, the court will then "assess cumulatively all the evidence" on which he relies "to determine whether it permits a reasonable factfinder to determine" that he was fired because of his sex. *Ibid.*; *see Knapp v. Evgeros, Inc.*, 205 F. Supp. 3d 946, 957 (N.D. Ill. 2016) (employing this two-step process).

The *McDonnell Douglas* framework allows Bergholz to forestall summary judgment if he adduces evidence showing that he (1) belonged to a protected class, (2) met his employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was similarly situated to other employees who were not members of the protected class and who were treated better—together, his prima facie case—provided that John Marshall fails to articulate a reasonable alternative explanation for his termination or he shows that the proffered alternative explanation is a pretext for discriminatory animus. *See David*, 846 F.3d at 225. Bergholz fails at the prima facie stage because he does not adduce evidence that a similarly situated woman received more favorable treatment than he did. Indeed, Bergholz admits that "no women were in comparable positions to [him] at the time of his employment at" John Marshall, Doc. 90 at ¶ 69, and that he "has no personal knowledge of any woman who worked for [John Marshall] and was treated more favorably than he was, or whom he thinks should have been terminated and was not," *id*. at ¶ 68. These admissions sink his prima facie case and thus his effort to defeat summary judgment using the *McDonnell Douglas* framework. *See David*, 846 F.3d at 227

(holding that the plaintiff's failure to identify a "similarly situated" comparator meant that she "failed to establish a prima facie case of discrimination under Title VII").

Bergholz also fails to adduce evidence establishing another component of his prima facie case: that he met John Marshall's legitimate expectations. To the contrary, the evidence shows that he did not. First, Bergholz responded in a delinquent fashion to Dickerson's request for data on certain alumni. Doc. 90 at ¶¶ 49-51. Although Bergholz contends he had a good reason for that delay—that his staff was tardy in assembling the data for him, Doc. 98 at ¶ 21—he adduces no evidence indicating that he informed Dickerson of that excuse. Second, Bergholz does not contest that, when he finally sent the data, he did so without explanation or analysis, Doc. 90 at ¶ 50, thus requiring Dickerson to do that work for him, *id*. at ¶ 51. Third, even though the court assumes that all the complaints about Bergholz lodged with Dickerson were false, the court can consider those complaints for their effect on Dickerson's view of Bergholz. *See Simpson*, 780 F.3d at 796. Dickerson could have reasonably credited the deluge of complaints and consequently concluded that Bergholz's conduct presented serious problems in the workplace, including some that would raise Title IX issues. Doc. 90 at ¶¶ 30-31, 35-42, 44, 55; Doc. 98 at ¶¶ 5, 8-13, 31, 37, 39. Finally, Dickerson's job required that she work directly with Bergholz, and she believed that Bergholz was not a good fit for her. *Id*. Doc. 90 at ¶ 45. Bergholz concedes that it is a central component of his job that Dickerson and he be a "good fit." *Id*. at ¶ 65. Given all this, Bergholz has failed to show that he was satisfying John Marshall's legitimate expectations. *See Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018) (holding that the plaintiff's failure to show that he met his employer's legitimate expectations "doomed" his prima facie case).

Because Bergholz cannot forestall summary judgment under the *McDonnell Douglas* framework, the court next "assess[es] cumulatively all the evidence" on which he relies "to determine whether it permits a reasonable factfinder to determine" that he was fired because of his sex. *David*, 846 F.3d at 224. Aside from his subjective belief that he was fired because he is a man, *see Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 548 (7th Cir. 2011) ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.") (internal quotation marks omitted), Bergholz offers two grounds on which a jury could find in his favor. Neither pass muster.

First, Bergholz argues that John Marshall's justifications for firing him are pretextual. Doc. 89 at 8-11. To prevail on this argument, Bergholz "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [John Marshall's] asserted reasons that a reasonable person could find them unworthy of credence." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 724 (7th Cir. 2018) (internal quotation marks and brackets omitted). "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 743-44 (7th Cir. 2011) (alterations and internal quotation marks omitted), *overruled on other grounds by Ortiz*, 834 F.3d at 764-65.

Bergholz contends that, contrary to John Marshall's explanation for his termination, he performed his job well and responded appropriately to all of Dickerson's requests. In support, he observes, among other things, that he handled the Springfield fundraising trip effectively, Doc. 89 at 10, was a faithful steward of John Marshall's resources, *ibid.*, and responded in a timely and sufficient manner to Dickerson's data requests, *id*. at 10-11. Bergholz also disputes the

validity of the complaints others at John Marshall lodged against him. Doc. 90 at ¶¶ 30-31, 35-42, 44, 55; Doc. 98 at ¶¶ 5, 8-13, 31, 37, 39.

Bergholz's argument fails because the record would not allow a reasonable jury to find that Dickerson's asserted sex-neutral justifications for firing him, even if unfair or inaccurate, were insincere. That is, a jury could not find that Dickerson fired Bergholz based on "a lie" or a "phony reason" to justify anti-male discrimination, as opposed to—at worst—"faulty reasoning or mistaken judgment" that led her to credit the many complaints lodged against him, to find his work product substandard, or to conclude that the two were not a good professional fit. *Silverman*, 637 F.3d at 743 (internal quotation marks and alterations omitted). It follows that Bergholz's disagreement with the grounds articulated to justify his firing cannot forestall summary judgment under the broader inquiry articulated in *Ortiz*. *See Skiba*, 884 F.3d at 724 (holding that a plaintiff can survive summary judgment only if a jury could reasonably find that the employer's stated reasons for an adverse employment action were "a lie" rather than an honest mistake based on "inaccurate or unfair" information) (internal quotation marks omitted).

Second, Bergholz contends that evidence concerning personnel decisions made by Dickerson after she terminated him would allow a jury to find that he suffered sex discrimination. Doc. 89 at 11-13. That evidence, set forth in Section C of the Background section, shows that Dickerson (1) appointed Weiner head of Development and Alumni Relations, Doc. 98 at ¶ 7; Doc. 96-3 at 3; (2) retained Zimmerman, despite her reputation for insubordination and poor behavior, Doc. 98 at ¶ 31; (3) terminated the Associate Dean of Admissions—who, like Bergholz, was an untenured male staff member—for alleged performance issues, *id.* at ¶ 33; (4) eliminated the position of Associate Professor Non-Tenure Track—affecting four women and one man—but with only the man being publicly identified as

12

unable to reapply for his job and for whom no alternate positions were available, *id.* at ¶ 32; (5) failed to discipline a female employee in the Registrar's Office who used Dickerson's signature without her approval, instead promoting her one month later, *id.* at ¶ 34; (6) promoted two female employees in the Registrar's Office to Assistant Registrar, while transferring a male employee to an undefined security position due to a policy prohibiting staff from dating supervisors, *id.* at ¶ 35; (7) narrowed the search for the Human Resources Director to four finalists—three women and one man—with the woman ultimately hired and the man given a less senior position, *id.* at ¶ 36; and (8) decided not to terminate Miss Criss—a long-time female staff member who had allegedly made racist comments—instead giving her an alumni fundraising position and allowing her to retire six months later, *id.* at ¶ 40.

This circumstantial evidence would not permit a reasonable jury to find that Bergholz was the victim of sex discrimination. True enough, evidence regarding how a decisionmaker treated others conceivably could show "that similarly-situated employees outside the protected class received systematically better treatment." *Boss v. Castro*, 816 F.3d 910, 916-17 (7th Cir. 2016). That said, "a finding of intentional discrimination may not be established merely with evidence that a person outside the protected class was treated better than the plaintiff." *Simpson*, 780 F.3d at 794. That principle defeats Bergholz's argument.

As an initial matter, the evidence cited by Bergholz fails to show "that similarly-situated [female] employees … received systematically better treatment." *Boss*, 816 F.3d at 917. Although Bergholz points to instances where certain female employees were retained and certain male employees were dismissed, Doc. 89 at 12-13, he concedes that "no women were in comparable positions to [him] at the time of his employment at [John Marshall]," Doc. 90 at ¶ 69, and that he "has no personal knowledge of any woman who worked for John Marshall

13

[who] was treated more favorably than he was, or whom he thinks should have been terminated and was not," *id*. at ¶ 68.

Moreover, the evidence does not show that the better treatment enjoyed by female employees was "systematic[]." *Boss*, 816 F.3d at 917 *Boss*, 816 F.3d at 917. Bergholz adduces no evidence regarding Dickerson's or John Marshall's decisionmaking processes for any of the above-referenced employment decisions. Doc. 90 at ¶ 66. This matters because the record provides no indication that those decisions were anything but ordinary workplace occurrences incomparable to and unconnected with his own. In Bergholz's case, Dickerson (1) faced a deluge of complaints about his behavior, (2) experienced significant issues with his performance, and (3) found that they had a suboptimal working relationship. None of the myriad personnel decisions cited by Bergholz are even remotely analogous to his termination. *Khowaja*, 893 F.3d at 1016 (holding, in response to the plaintiff's argument that another employee was treated better than he was, that "[d]espite … similarities on the surface, there [were] significant distinctions in their treatment that undermine[d] any comparison").

It also bears mention that the personnel decisions cited by Bergholz that negatively affected men have sex-neutral explanations: Dickerson's decision to terminate the Associate Dean of Admissions, for example, was due to performance issues which Bergholz does not contest, *id*. at ¶ 33, and her decision to transfer a male employee to a security position was due to a policy prohibiting staff from dating supervisors, *id*. at ¶ 35. Viewed as a whole, Bergholz's evidence regarding other employment decisions at John Marshall would not allow a reasonable jury to find that Dickerson was "animated by [sex discrimination] or had a propensity to evaluate employees based on [sex]." *Simpson*, 780 F.3d at 791.

B. **Title IX**

Title IX "prohibits discrimination on the basis of gender by educational institutions receiving federal financial assistance." *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 917 (7th Cir. 2012). In enacting Title IX, Congress had "two principal objectives in mind: 'To avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.'" *Parker*, 667 F.3d at 917 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998)) (alterations omitted).

John Marshall correctly argues that Bergholz's Title IX claim is precluded by Title VII. Doc. 79 at 12-13. In *Waid v. Merrill Area Public Schools*, 91 F.3d 857 (7th Cir. 1996), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009), the Seventh Circuit held that "Title VII provides a comprehensive statutory scheme for protecting rights against discrimination in employment," and that it is "well-established that Title VII's own remedial mechanisms are the only ones available to protect the rights created by Title VII." *Id*. at 861-62 (citing *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372-78 (1979)). The Seventh Circuit recently reiterated the point in *Brown v. Ill. Dep't of Human Res.*, 717 F. App'x 623 (7th Cir. 2018), holding that "all employment-discrimination claims must be brought under Title VII." *Id*. at 625-26. It follows that Bergholz's Title IX claim is precluded by Title VII. *See Waid*, 91 F.3d at 862 (holding that "Title VII preempted any of [the plaintiff's] claims for equitable relief under … Title IX"); *Ludlow v. Nw. Univ.*, 125 F. Supp. 3d 783, 790-91 (N.D. Ill. 2015) (noting that decisions in this District have "uniform[ly] [found] that employment discrimination claims under Title IX are preempted by Title VII under *Waid*"); *see also Lakoski v. James*, 66 F.3d 751, 753-54 (5th Cir. 1995) (holding the same); *but see Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 563 (3d Cir. 2017) (citing *Lakoski* and *Waid* for the proposition that "the Fifth and Seventh Circuits have held categorically that Title VII provides the exclusive

remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions," but "declin[ing] to follow [them]") (internal quotation marks omitted).

In any event, to survive summary judgment on any Title IX claim that could coexist with his Title VII claim, Bergholz must adduce evidence that would allow a reasonable jury to find that he was discriminated against on the basis of his sex. *See Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019); *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019); *Parker*, 667 F.3d at 917. For the reasons set forth in addressing his Title VII claim, Bergholz has not done so.

## II. State Law Claims Against Niedwiecki

Bergholz brings state law claims (intentional interference with contract and prospective economic advantage) against Niedwiecki. Doc. 1 at ¶¶ 51-63. The complaint—correctly, given that the parties are not diverse—premises jurisdiction over these claims on the supplemental jurisdiction statute, 28 U.S.C. § 1367(a). Doc. 1 at ¶ 7. Section 1367(c)(3) provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if … the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining [supplemental] state claims." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007); *see also Dietchweiler ex rel. Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (same). That general rule has three exceptions: "when the [refiling] of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim[s] [are] to be decided." *Williams*, 509

F.3d at 404; *see also RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 480 (7th Cir. 2012) (same).

None of the exceptions apply here. First, if this court relinquishes supplemental jurisdiction over the state law claims, Illinois law would give Bergholz one year to refile those claims in state court if their limitations period(s) expired while the case was pending here. *See Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 515 (7th Cir. 2009) (citing 735 ILCS 5/13-217); *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (same). Second, substantial federal judicial resources have not yet been committed to the state law claims. Third, it is not "absolutely clear how the [supplemental] claims can be decided." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994); *see also id*. at 1252 (holding that "retention of a state-law claim is appropriate when the correct disposition of the claim is so clear as a matter of state law that it can be determined without further trial proceedings and without entanglement with any difficult issues of state law") (internal quotation marks omitted). Because no exception applies, relinquishing jurisdiction over the state law claims is the appropriate course under § 1367(c)(3). *See RWJ Mgmt. Co.*, 672 F.3d at 479-80; *Wright*, 29 F.3d at 1251-53.

**Conclusion**

John Marshall is granted summary judgment as to Bergholz's claims against it, and the court relinquishes jurisdiction over Bergholz's claims against Niedwiecki. Bergholz may pursue his claims against Niedwiecki in state court, subject of course to any applicable defenses.

March 5, 2020

_____
United States District Judge

17